**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
Anthony J. Patek (State Bar No. 228964)
anthony@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| VISHAL SHAH AND CHRISTINE WILEY, individually, on behalf of themselves, the general public, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNIVERSAL MUSIC GROUP, INC.,<br><br>Defendant. | CASE NO.<br><br>**AMENDED CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51)**<br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS

INTRODUCTION .......... 3

THE PARTIES .......... 5

JURISDICTION AND VENUE .......... 5

SUBSTANTIVE ALLEGATIONS .......... 6

A. Defendant Programmed the Websites to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies. .......... 6

B. Defendant Falsely Informed Users That They Could Reject the Websites' Use of Cookies. .......... 11

C. The Private Communications Intercepted and Collected Through Third Party Cookies on Defendant's Websites. .......... 18

1. The Websites Cause the Interception of the Contents of Communications .......... 18

2. Facebook Cookies .......... 19

3. Google Cookies .......... 23

4. TikTok Cookies .......... 28

5. Snapchat Cookies .......... 32

6. Appreciation Engine Cookies .......... 33

D. The Private Communications Collected are Valuable. .......... 34

PLAINTIFFS' EXPERIENCES .......... 35

CLASS ALLEGATIONS .......... 42

CAUSES OF ACTION .......... 44

First Cause of Action: Invasion of Privacy .......... 44

Second Cause of Action: Intrusion Upon Seclusion .......... 47

Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) .......... 49

Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) .......... 54

Fifth Cause of Action: Unjust Enrichment .......... 56

Plaintiffs Vishal Shah and Christine Wiley ("Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against Universal Music Group, Inc. ("Defendant" or "UMG"). Plaintiffs' allegations against Defendant are based on information and belief and the investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based on their personal knowledge.

## INTRODUCTION

1. This Class Action Complaint concerns egregious violations of consumer privacy and breach of consumer trust in violation of California law. When consumers visit Defendant's websites,[1] Defendant displays to them a popup cookie consent banner. Defendant's cookie banner discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that they do not have to accept cookies, rather, they can choose to manage "Cookie Choices" as shown in the following screenshot, which is from the postmalone.com Website and is substantially similar to the cookie consent banners on all of the Websites:

[1] Defendant's websites including, but are not limited to, the following: www.postmalone.com; www.universalmusic.com; www.billieeilish.com; store.billieeilish.com; www.justinbiebermusic.com; store.justinbiebermusic.com; www.theweeknd.com; xo.store; www.arianagrande.com; shop.arianagrande.com; shop.postmalone.com; www.carlyraemusic.com; www.demilovato.com; shop.demilovato.com; www.icespicemusic.com; www.imaginedragonsmusic.com; shop.imaginedragonsmusic.com; www.iamlilbaby.com; shop.iamlilbaby.com; www.lilyachtyofficial.com; lilyachtyshop.com; www.maroon5.com; www.mumfordandsons.com; storeus.mumfordandsons.com; www.neildiamond.com; shop.neildiamond.com; www.neyothegentleman.com; shop.neothegentleman.com; www.nickiminajofficial.com; shop.nikiminajofficial.com; www.shaniatwain.com; officialstore.shaniatwain.com; www.snowpatrol.com; www.thecure.com; www.thekillersmusic.com; shop.thekillersmusic.com; www.themamasandthepapasofficial.com; www.2pac.com; and shop.2pac.com (each a "Website" and collectively, the "Websites").




2. Like most internet websites, Defendant designed the Websites to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendant affirmatively represented that users could browse the Website without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false.

3. Even after users elect to manage their "Cookie Choices" and "Decline All" "Online Advertising" and "Performance and Analytics" cookies, Defendant nonetheless caused multiple third parties—including Meta Platforms, Inc. (Facebook), Google LLC (Google Analytics), ByteDance Ltd. (TikTok), Snap Inc. (SnapChat), and Appreciation Engine Inc. (the "Third Parties")—to place and/or transmit cookies that track users' website browsing activities and eavesdrop on users' private communications on the Website.

4. Contrary to users' express rejection of cookies and tracking technologies, Defendant caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These third-party cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

5. The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

6. This type of tracking and data sharing is exactly what visitors to the Websites sought to avoid when they adjusted their cookie settings to decline or reject cookies. Defendant falsely told users of the Websites that it respected their privacy choices and would refrain from tracking and data sharing when users rejected cookies. Despite receiving clear notice of users' lack of consent, Defendant ignored those choices and violated state statutes and tort duties owed to Plaintiffs and those similarly situated Website users.

## **THE PARTIES**

7. Plaintiff Vishal Shah is, and was at all relevant times, an individual and resident of San Jose, California. Plaintiff Shah intends to remain in California and makes his permanent home there.

8. Plaintiff Christine Wiley is, and was at all relevant times, an individual and resident of Long Beach, California. Plaintiff Wiley intends to remain in California and makes her permanent home there.

9. Defendant Universal Music Group, Inc. is a Delaware corporation with its headquarters in Santa Monica, California.

## **JURISDICTION AND VENUE**

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

11. The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State

of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

13. Plaintiffs accordingly alleges that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

### A. Defendant Programmed the Websites to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.

14. Every website, including the Websites, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Website, the user's browser sends a "GET" request to the Websites' server(s). The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address, which allows the Website server to identify the origin of the request and return the response.

15. An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

16. As a result, Defendant knew that the devices used by Plaintiffs and Class members to access the Websites were located in California.

17. Defendant voluntarily integrated "third-party resources" from the Third Parties into the Websites' programming. "Third-party resources" refer to tools, content or services provided by third-parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Websites is done so pursuant to agreements between Defendant and those Third Parties.

18. The Websites cause users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

19. First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Websites' server(s)). First-party cookies are used to track users when they repeatedly visit the same website.

20. A third-party cookie is set by a third-party domain/webserver (e.g., www.facebook.com; www.google.com; analytics.tiktok.com; tr.snapchat.com etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

21. As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Websites are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;
- **Visit History**: Information about the frequency and total number of visits to the Website;
- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;
- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;
- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;
- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;
- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;
- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;
- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;
- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or
- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

22. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to enhance website performance and generate revenue through data collection and targeted advertising.

23. Defendant is one the largest music companies in the world. Defendant owns and operates the Websites, which allow visitors to receive information about musicians and purchase products. As they interact with the Websites (e.g., by entering data into forms, clicking on links, and making selections), Website users communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

24. Defendant chose to install or integrate its Websites with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Websites, both

first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Websites, or that Defendant causes to be loaded. Because Defendant controls the Websites' software code, it has complete control over whether first-party and third-party cookies are placed on its users' devices and/or transmitted to third parties.

25. Defendant explained the third-party cookies it used on the Websites as follows in its Privacy Policy:

> Our Apps [websites, applications, stores, and other services (which we refer to in this privacy policy as 'Apps')] use cookies and other similar technologies to improve your experience and support targeted advertising. For the purpose of this Cookies Policy, cookies, and other similar technologies (like scripts, plug-ins, tags, device fingerprints, Local Stored Objects, beacons, and pixels) are all referred to as 'cookies.'
>
> You can find more information about the cookies and other tracking technologies we use, the purposes for which we use them, and make certain choices about cookies through the cookie choices tools available on our Apps.[2]

26. Defendant further explained the third-party cookies it used on the Websites as follows in its cookie consent preferences window:

> We use cookies or other tracking technologies from the following partners. These are used to personalize your experience, connect with social networks, and tailor advertising to better match your interests. This may include tracking across our sites, sites operated by third parties, and multiple devices.
>
> Online Advertising [Cookies]
>
> Used to serve online advertisements on this site or another site you may visit in the future, either directly or a supporting function.
>
> Performance and Analytics [Cookies]
>
> Used to improve our site. Not used for online advertising purposes or by third parties for their own use.

[2] Universal Music Group Privacy Policy (Effective Date: January 1, /2023) (current version available at https://privacy.umusic.com/) (the "Privacy Policy"). Defendant has subsequently updated its Privacy Policy but, based on information and belief, this version was in effect at the time of Plaintiffs' rejection of cookies on the Websites.

**B. Defendant Falsely Informed Users That They Could Reject the Websites' Use of Cookies.**

27. When Plaintiffs and other consumers in California visited the Websites, the Websites immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated, in relevant part, "We are passionate about music. To help us share that passion we'd like to use cookies and similar technologies to personalize your experiences on our sites and to advertise on other sites. For more information and additional choices click Cookie Choices below." The banner then purported to provide users the opportunity to click "Cookie Choices" to make cookie choices as shown, in the following screenshot from the postmalone.com Website, which is substantially similar to the other Websites:




28. Plaintiffs and other users of the Websites who clicked or selected the "Cookie Choices" link are presented with the cookie consent preferences window (referred to as the cookie choices tool in the Privacy Policy) depicted in the screenshots below.


UNIVERSAL
UNIVERSAL MUSIC GROUP
Information We Co
Privacy Policy
Information We Collect About You
We want to be transparent about the data we and our partners collect and how we use it, so you can best exercise control over your personal data. For more information, please see our .
Information Our Partners Collect
We use cookies or other tracking technologies from the following partners. These are used to personalize your experience, connect with social networks, and tailor advertising to better match your interests. This may include tracking across our sites, sites operated by third parties, and multiple devices.
Categories
2 of 2 allowed
Online Advertising
Decline All
Cancel
Now


UNIVERSAL
UNIVERSAL MUSIC GROUP
Information We Co
Privacy Policy
social networks, and tailor advertising to better match your interests. This may include tracking across our sites, sites operated by third parties, and multiple devices.
Categories
2 of 2 allowed
Online Advertising
Used to serve online advertisements on this site or another site you may visit in the future, either directly or a supporting function.
Performance and Analytics
Used to improve our site. Not used for online advertising purposes or by third parties for their own use.
Decline All
Cancel
Now







29. The cookie consent preferences window represented to users that they could either choose to "Decline All" cookies or move the toggles to the left, indicating their choice and/or agreement to reject all "Online Advertising" and "Performance and Analytics" cookies.

30. Defendant's popup cookie consent banner and cookie consent preferences window led Plaintiffs, and all those Website users similarly situated, to believe that they declined all "Online Advertising" and "Performance and Analytics" cookies and tracking technologies, especially those that used to "personalize your experience, connect with social networks, and tailor advertising to better match your interests" and those used to "serve online advertisements on this site or another site you may visit in the future." The banner and cookie

consent preferences window further reasonably led Plaintiffs and those Website users similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon rejecting cookies by clicking "Decline All" or upon toggling off all "Online Advertising" and "Performance and Analytics" cookies in the cookie consent preferences window.

31. Defendant's representations, however, were false. In truth, Defendant did not abide by its users' wishes. When Plaintiffs and other users of the Websites clicked the "Cookie Choices" link and either clicked "Decline All" or toggled off all "Online Advertising" and "Performance and Analytics" cookies, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website. Nevertheless, Defendant caused the Third Party tracking cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data.

32. In particular, when users rejected all "Online Advertising" and "Performance and Analytics" cookies, Defendant nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by rejecting cookies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

33. Some aspects of the operations of the Third Party cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshots, obtained using one such tool, show examples of Third-Party cookies being transmitted from a Website user's device and browser to Third Parties even after the user clicked the "Cookie Choices" link on the postmalone.com Website's popup cookie banner and clicked "Decline All" "Online Advertising" and "Performance and Analytics" cookies in the cookie consent preferences window.






34. The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third party websites while the user visited and interacted with Defendant's Website at postmalone.com/music/. The screenshots depict only network traffic occurring ***after*** the user rejected all cookies using the cookie banner. As shown above, despite the user's rejection of all cookies, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like www.facebook.com; www.google.com; analytics.tiktok.com; tr.snapchat.com, etc. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that Defendant caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers declined or rejected all cookies and tracking technologies by clicking the "Cookie Choices" link in the banner and either clicking "Decline All" or toggling off all

"Online Advertising" and "Performance and Analytics" cookies in the cookie consent preferences window. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's rejection of all cookies.

35. The other Websites similarly cause consumers' devices to transmit user data to third parties—even after consumers reject cookies—on those Websites.

36. Plaintiffs' and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, are surreptitiously obtained by the Third Parties via these cookies.

37. As users interact with the Websites, even after clicking or selecting the "Cookie Choices" link and clicking "Decline All" or toggling off all "Online Advertising" and "Performance and Analytics" cookies, thereby declining or rejecting the use of cookies and similar technologies for personalized content, advertising, social media, and analytics, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies cause Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

38. The Third Party code that the Websites cause to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

### C. <u>The Private Communications Intercepted and Collected Through Third Party Cookies on Defendant's Websites.</u>

#### 1. The Websites Cause the Interception of the Contents of Communications

39. Each of the Websites include search bars and other input fields which users enter information. For example, below is a screenshot of the search bar on the Post Malone Website where users can type into the search bar to cause the Website to search its contents.




40. All of the Websites include a similar search bar that allows users to input a search query and search the website.

41. When users input the information into the search bar, they intend to communicate the contents of their search directly to the Websites.

42. Instead, Defendant programmed the Websites so that the contents of those communications are intercepted by the Third Parties while the communications are in transit between the user's browser and the Websites.

### 2. Facebook Cookies

43. Defendant causes third party cookies to be transmitted to and from Website users' browsers and devices to and from the **facebook.com** domain, even after users elect to reject cookies (including "Online Advertising" and "Performance and Analytics" cookies). This domain is associated with Meta's digital advertising and analytics platform that collects user information via cookies and other data to assist Meta in performing data collection, behavioral analysis, user retargeting, and analytics.[3] Meta serves targeted ads to web users across Meta's ad network, which spans millions of websites and apps.

44. The facebook.com cookies help Meta track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. For example, when a user clicks a button on the Post Malone Website, Defendant causes the following data to be transmitted to Meta:

Request Header Query Body Cookies Raw Summary +

Filter (Show: ⌘F, Hide: ESC)

| Key | Value |
| --- | --- |
| id | 567318173708059 |
| ev | SubscribedButtonClick |
| dl | https%3A%2F%2Fwww.postmalone.com%2F |
| rl | |
| if | false |
| ts | 1705373584124 |
| cd[buttonFeatures] | %7B"classList"%3A""%2C"destination"%3A"https%3A%2F%2Fwww.postmalone.com%2Fmusic%2F"%2C"id"%3A""%2C"imageUrl"%3A""%2C"innerText"%3A"3%20Music"%2C"numChildButtons"%3A0%2C"tag"%3A"a"%2C"type"%3Anull%2C"name"%3A""%7D |
| cd[buttonText] | 0%20Music |
| cd[formFeatures] | %5B%5D |
| cd[pageFeatures] | %7B"title"%3A"Home%20-%20Post%20Malone"%7D |

[3] https://www.facebook.com/privacy/policies/cookies/.

| | |
|---|---|
| cd[parameters] | %5B%7B"extractorID"%3A"983912028930073"%2C"jsonLD"%3A%7B"%40context"%3A"http%3A%2F%2Fschema.org"%2C"%40type"%3A"Product"%2C"offers"%3A%7B"priceCurrency"%3A"USD"%7D%7D%7D%2C%7B"extractorID"%3A"510381970580001"%2C"jsonLD"%3A%7B"%40context"%3A"http%3A%2F%2Fschema.org"%2C"%40type"%3A"Product"%2C"offers"%3A%7B"priceCurrency"%3A"USD"%7D%7D%7D%2C%7B"extractorID"%3A"746312723441922"%2C"jsonLD"%3A%7B"%40context"%3A"http%3A%2F%2Fschema.org"%2C"%40type"%3A"Product"%2C"offers"%3A%7B"priceCurrency"%3A"USD"%7D%7D%7D%2C%7B"extractorID"%3A"4890584354385767"%2C"jsonLD"%3A%7B"%40context"%3A"http%3A%2F%2Fschema.org"%2C"%40type"%3A"Product"%2C"offers"%3A%7B%7D%7D%7D%2C%7B"extractorID"%3A"5068697316551179"%2C"jsonLD"%3A%7B"%40context"%3A"http%3A%2F%2Fschema.org"%2C"%40type"%3A"Product"%2C"offers"%3A%7B%7D%7D%7D%5D |
| sw | 1440 |
| sh | 900 |
| ud[external_id] | 2879a2aa3e9ce31d521059187621e363725e67f6a6b855873bb2717cd076b7ca |
| v | 2.9.140 |
| r | stable |
| a | tmSimo-GTM-WebTemplate |
| ec | 5 |
| o | 4126 |
| fbp | fb.1.1705373468483.717694418 |
| ler | empty |
| cs_est | true |
| it | 1705373468138 |
| coo | false |
| es | automatic |
| tm | 3 |
| cdl | |
| rqm | GET |

45. The data above informs Facebook of various aspects of the user's Website interactions, including, without limitation, (i) that the user was visiting the page entitled "Home – Post Malone"; (ii) that the user clicked on the link entitled "Music"; and (iii) that the destination URL of the "Music" link was https://www.postmalone.com/music. The data also includes the "fbp" parameter, which enables Facebook to correlate the user with his or her Facebook account, to discern his or her identity.

46. The "ev" parameter denotes an "Event." In this case, the event is a "SubscribedButtonClick," indicating to Facebook that the user has clicked a specific button on

the Website. The "cd[buttonText]" parameter discloses to Facebook the exact text of the button the user clicked. In this case, the text is "MUSIC."

47. The "dl" parameter is the "Document Location." It tells Facebook the specific webpage on which the Event occurred – in this case, https://www.postmalone.com.

48. The "ts" parameter corresponds to a "Timestamp," and tells Facebook the exact time—down to the millisecond—at which the user viewed the page.

49. The "fbp" parameter is the Facebook Browser ID, and is used to track the user's activity across the Internet.

50. The "sw" and "sh" parameters stand for "screen width" and "screen height," and correspond to the display the user was viewing when the event was recorded.

51. Cookies are sent along with all data transmissions to Meta. For instance, the following cookies were sent along with the "Music" link click event:

**Request** Header Query Body Cookies Raw Summary +

| Key | Value |
| --- | --- |
| sb | wMc6ZbbFb74Fc_LxDblbPrWU |
| datr | wMc6ZeWp1blqBSAzHYlnWSQh |
| c_user | 1345507951 |
| xs | 22%3Aap6yYloGlsEe4Q%3A2%3A1705373203%3A-1%3A2633 |
| fr | 1aQVSY8AKJ2XujGq9.AWUY0FRdobaZC9V74I7_eLM1638.Bljcb2.a9.AAA.0.0.Blpe4U.AWXOO69bNbU |

52. The "c_user" cookie shown above enables Facebook to identify a specific user when they are logged in to their account. The "c_user" cookie stores a user's unique ID, which is associated with their Facebook profile. This ID enables Facebook to track user interactions on its platform and across sites that use Facebook plugins, such as browsing to specific pages, clicking "Like" buttons, or engaging with comment sections. When combined with other data sent to the Facebook domain, this cookie allows Meta to track users' browsing activities. Facebook uses this data for various purposes, such as personalizing content, enhancing ad targeting accuracy, and refining its user experience.

53. In particular, by identifying users who have shown interest in certain products or content, the facebook.com cookies cause Meta's advertising platform to enable advertisers to

show relevant ads to those users when they visit other websites within Meta's ad network.[4] These cookies allow Meta to collect data on how users interact with websites, regardless of whether the user has a Facebook account or is logged in.[5]

54. The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses).[6]

55. Meta utilizes the data collected through the facebook.com cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as (i) **Ad Targeting and Retargeting**, in which Meta uses the facebook.com cookie to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. This profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) **Conversion Tracking**, in which Meta uses the facebook.com cookie to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter; (iii) **Audience Insights and Analytics**, in which Meta uses the facebook.com cookie to provide data to businesses on user demographics, interests, and behaviors across their sites and apps; and (iv) **Cross-Device and Cross-Platform Tracking**, in which Meta uses the facebook.com cookie to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

56. In addition, the Websites cause the user's "user-agent" information to be sent to Meta. The user-agent corresponds to the device and browser that the user has used to access the Website.

---

[4] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect.

[5] https://allaboutcookies.org/what-data-does-facebook-collect.

[6] *Id.*

57. Finally, the data sent to Meta includes the user's IP address.

**3. Google Cookies**

58. Defendant causes third party cookies to be transmitted to and from the Websites users' browsers and devices, even after users reject all cookies (including "Online Advertising" and "Performance and Analytics" cookies) to and from the **www.google-analytics.com** domain. This domain is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[7] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google cookies.[8] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies enable its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[9]

59. Cookies are sent when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[10] "Pages with Google Marketing

---

[7] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

[8] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

[9] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).

[10] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

60. Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[11] "To measure a website . . . [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect . . . information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[12]

61. Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors,

[11] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

[12] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

(viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data.[13]

62. For example, the Google software code that Defendant causes to be stored on and executed by the Post Malone Website user's device causes the following data to be sent to Google's domain, at https://www.google-analytics.com/collect:

**Request** Header Query Body Cookies Raw Summary

Filter (Show: ⌘F, Hide: ESC)

| Key | Value |
|---|---|
| v | 1 |
| _v | j101 |
| a | 1496380128 |
| t | event |
| ni | 1 |
| _s | 1 |
| dl | https://www.postmalone.com/ |
| dr | |
| ul | en-us |
| de | UTF-8 |
| dt | Home - Post Malone |
| sd | 30-bit |
| sr | 1440x900 |
| vp | 647x683 |
| je | 0 |
| ec | heat mapping |

[13] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

| | |
|---|---|
| el | pu:https://www.postmalone.com/\|ct:3 music\|rx:0.69\|ry:0.02 |
| _u | aGjAgEI7AAAAAGgNKkC~ |
| cid | 1347150888.1705373562 |
| tid | UA-64886620-5 |
| _gid | 1289845272.1705373584 |
| gtm | 45He41a0n81KMZ74ZCv812804953 |
| gcs | G100 |
| gcd | 11m1m1l1l5 |
| dma | 0 |
| linkid | main-nav |
| z | 1478277877 |

63. The "cid" parameter above refers to "Client ID." It contains a unique identifier for a user's browser and device, that allows Google to link the user to their interactions with the Website.[14] The "_gid" parameter is the Google Analytics Google ID, also used to identify the user.[15]

64. The "dl" parameter tells Google what webpage the user was viewing on the Website, and the "dt" parameter contains the title of that page.

65. Along with this data, the Google software code that Defendant causes to be stored on and executed by users' devices causes cookies to be sent to Google's analytics domain.

66. Further, along with all of this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Google:

| Key | Value |
|---|---|
| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/121.0.0.0 Safari/537.36 |

[14] *See, e.g.*, https://cheatography.com/dmpg-tom/cheat-sheets/google-universal-analytics-url-collect-parameters/; https://www.analyticsmarket.com/blog/how-google-analytics-collects-data/; https://www.owox.com/blog/use-cases/google-analytics-client-id/.

[15] *See, e.g.*, https://www.optimizesmart.com/google-analytics-cookies-ultimate-guide.

67. The "user-agent" corresponds to the device and browser that the user has used to access the Website. In this case, the user-agent value corresponds to Google's Chrome browser version 121, running on the Catalina version of macOS.[16]

68. Finally, the data sent to Google contains the user's IP address.

69. Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie causes Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, etc.), and to perform targeted advertising and marketing analytics.

70. Thus, the Google cookies used on the Websites cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[17]

71. Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers

[16] There are many tools on the web that are capable of parsing user-agent strings to determine what browser and operating system they pertain to. One such tool is located at https://explore.whatismybrowser.com/useragents/parse.

[17] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).

share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[18] Thus, Google has the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

**4. TikTok Cookies**

72. Defendant also causes third party cookies to be transmitted to and from the Websites users' browsers and devices, even after users have rejected all "Online Advertising" and "Performance and Analytics" cookies, to and from the **analytics.tiktok.com** domain. This domain is associated with TikTok for Business, a suite of tools offered by TikTok, a social media platform owned by ByteDance Ltd., known for short-form video sharing. The TikTok platform is used to create and share videos, and it utilizes cookies for various purposes including assisting brands and marketers to create, manage, and optimize ad campaigns on the platform.[19]

73. TikTok utilizes analytics.tiktok.com cookies to collect data on user interactions with websites that have integrated TikTok's tracking technologies (such as the Website). These cookies are used to "measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[20] TikTok further explains that it uses cookies to "match events with people who engage with your content on TikTok. Matched

[18] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

[19] *See, e.g.*, TikTok for Business (https://ads.tiktok.com/business/en-US/products/ads; and https://ads.tiktok.com/business/en-US/products/measurement); TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[20] TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

events are used to improve measurement and optimize ad campaigns. They can also contribute to building your retargeting and engagement audiences." *Id.* These cookies enable TikTok to recognize and track users across different sessions and domains (i.e., cross-site tracking) and to collect and synchronize user data across sessions and domains to observe and evaluate TikTok user behavior.

74. These cookies enable TikTok to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, including *email addresses and phone numbers*; (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) session information, (x) user identifiers, and (xi) geolocation data in the form of the IP address.[21]

75. For example, the TikTok software code that Defendant causes to be stored on and executed by the Post Malone Website user's device causes the following data to be sent to TikTok's domain, at https://analytics.tiktok.com:

[21] *Id.*; *see also* TikTok for Business: Enhance Data Postback with the TikTok Pixel (https://ads.tiktok.com/help/article/enhance-data-postback-with-the-tiktok-pixel?lang=en); TikTok for Business: Advanced Matching for Web (available at https://ads.tiktok.com/help/article/advanced-matching-web?redirected=1); TikTok for Business: About TikTok Pixel (available at https://ads.tiktok.com/help/article/tiktok-pixel?lang=en).

Request Header Query Body Cookies Raw Summary + Tree View


| Key | Value |
| --- | --- |
| action | Click |
| message_id | messageId-1705373562386-2885444301038 |
| ⌄ context | Object(11 items) |
| › device | Object(1 items) |
| index | 0 |
| ⌄ library | Object(2 items) |
| name | pixel.js |
| version | 2.1.33 |
| variation_id | test_3 |
| ⌄ pixel | Object(3 items) |
| runtime | 1 |
| codes | CJBAV83C77U0073JS4BG\|BV8MCH9G18MG0UVLUJR... |
| code | CJBAV83C77U0073JS4BG |
| ⌄ ad | Object(2 items) |
| sdk_env | external |
| jsb_status | 2 |
| session_id | 1916bc5c-b41a-11ee-8c8b-1070fd0eb26c::c0iFegjO... |
| pageview_id | pageId-1705373468446-8494432032344 |
| userAgent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) Apple... |
| ⌄ page | Object(2 items) |
| url | https://www.postmalone.com/ |
| referrer | |
| ⌄ user | Object(1 items) |
| anonymous_id | AnknTjUaaWgluRagirT34KhuKTC |
| event_id | |
| is_onsite | false |
| properties | Object(0 items) |
| timestamp | 2024-01-16T02:52:42.386Z |
| ⌄ auto_collected_properties | Object(2 items) |
| ⌄ trigger_element | Object(7 items) |
| › position | Object(2 items) |
| num_child_buttons | 0 |
| inner_text | CLOSE |
| tag | BUTTON |
| ⌄ attributes | Object(1 items) |
| class | md-close |
| xpath | /HTML/body[1]/div[1]/div[3]/div[1]/div[1]/main[1]/div[1... |
| timestamp | 2024-01-16T02:52:42.384Z |
| page_trigger | Click |
| _inspection | Object(0 items) |


76. The data includes the "session_id," which is a unique identifier generated by TikTok to track a user's activity. This allows TikTok to correlate the user's behavior from a

browsing session, including page views and conversions, to a particular user or device to enhance advertising measurement, attribution, and targeting.[22]

77. The data further indicates, among other things, that the user has viewed the page on the Defendant's website at the url https://www.postmalone.com, and that the user has clicked on a button with the text "CLOSE."

78. Along with this data, the TikTok software code that Defendant causes to be stored on and executed by the user's device causes the "_ttp" cookie to be sent to TikTok's domain:

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| _ttp | 2XGbvlu56WnDuCDoRJw0lZYq9lo |
| ttwid | 1%7CcXsVdNsZq2D-e4nl3eDAI4DhNvbkvEpGSzzsNxeNlDA%7C1698267194%7C5dded9972014d49d1c9dc50ce86e74b797e4580f2b9ab39a53fbe915cef06188 |

79. According to TikTok's documentation, the "_ttp" cookie is one of the company's advertising cookies, the purpose of which is "[t]o measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[23]

80. According to TikTok's documentation, "[t]he 'ttwid' first-party cookie is for analytics and web optimisation."[24]

81. Further, along with all of this data, the TikTok software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to TikTok:

| Key | Value |
|---|---|
| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/121.0.0.0 Safari/537.36 |

---

[22] *See, e.g.*, How to get TikTok session id? (available at https://gbtimes.com/how-to-get-tiktok-session-id/).

[23] *See* TikTok for Business: Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[24]https://www.tiktok.com/legal/page/global/tiktok-website-cookies-policy/en

As discussed above with respect to Google, the "user-agent" corresponds to the device and browser that the user has used to access the Website. In this case, the user-agent value corresponds to Google's Chrome browser version 121, running on the Catalina version of macOS.[25]

82. Finally, the data sent to TikTok includes the user's IP address.

83. By collecting this user data, TikTok performs user behavior tracking (i.e., monitoring user actions like page views, clicks, and interactions to understand user engagement); advertising optimization (i.e., gathering data to enhance the relevance and effectiveness of TikTok advertising campaigns); and performance measurement (i.e., assessing the success of marketing efforts by analyzing user responses to ads and content).[26]

84. Further, TikTok's Automatic Advanced Matching feature functions as follows: "When a visitor lands on your website and inputs customer information during registration, sign-in, contact, or checkout on a website where you installed your pixel, Automatic Advanced Matching will capture information from those fields. …TikTok will use hashed information to link event information to people on TikTok. Tiktok may use matched events to better attribute events to TikTok ads, optimize advertisers' future campaigns, and depending on advertisers' and users' settings, TikTok may also add people to advertisers' retargeting or engagement audiences."[27]

**5. Snapchat Cookies**

85. Defendant also causes third party cookies to be transmitted to and from the Websites users' browsers and devices, even after users elect to reject all "Online Advertising" and "Performance and Analytics" cookies, to and from the **tr.snapchat.com** domain.

---

[25] There are many tools on the web that are capable of parsing user-agent strings to determine what browser and operating system they pertain to. One such tool is located at https://explore.whatismybrowser.com/useragents/parse.

[26] *See* TikTok for Business: Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[27] TikTok for Business: How to set up Automatic Advanced Matching (available at https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en).

86. The subdomain tr.snapchat.com is associated with Snap Inc. (SnapChat), a social media company that uses its cookies to measure users' conduct across distinct websites to help advertisers target ads.[28] SnapChat uses tr.snapchat.com cookies to collect data on browsing history, choices, and interactions with advertisements.[29] This data helps Snapchat personalize ad content and track users across the internet.[30].

87. These cookies allow SnapChat to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data.

**6. Appreciation Engine Cookies**

88. Defendant also causes third party cookies to be transmitted to and from the Websites users' browsers and devices, even after users elect to reject all "Online Advertising" and "Performance and Analytics" cookies, to and from the **umg.theappreciationengine.com** domain.

89. The domain theappreciationengine.com is associated with Appreciation Engine Inc., a marketing company that uses its cookies and other data to measure users' conduct across distinct websites for marketing purposes.[31] According to the company's website, "AE collects data from [user] social media and streaming interactions, giving you access to a rich pool of first-party data that you can't find anywhere else."[32]

90. According to Appreciation Engine's documentation, the scope of their monitoring and tracking is vast: "We listen to everything a member does on the social channels they've hooked up to our engine. Then we compare what they do socially against the brands

[28] *See* https://snapdiscoveries.com/what-is-tr-snapchat-com-is-used-for.
[29] *Id.*
[30] *Id.*
[31] *See* https://get.theappreciationengine.com/.
[32] *Id.*

you've entered into our engine. Whenever a member interacts with a brand you've put in our engine, we score and store that information. We call this filtering."[33]

91. According to Appreciation Engine's documentation, the company can track users' activity on at least Apple Music, Deezer, Discord, Facebook, Foursquare, Google, Kakao, Napster, Reddit, Spotify, TikTok, Tumblr, Twitch, Twitter, and Youtube.[34]

92. The collected data enables the Appreciation Engine to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data.

**D. The Private Communications Collected are Valuable.**

93. The Private Communications tracked and collected through cookies on the Websites are valuable to Defendant and the Third Parties. Defendant uses this data to measure and optimize marketing campaigns, evaluate website design and product placement, and target specific users or groups of users with advertising. For example, Defendant can identify California users who visit webpages related to particular music genres or artists and then target those users with advertisements for similar music artists both on the Websites and across unrelated third-party websites.

94. Data reflecting users' browsing activity allows Defendant to identify behavioral patterns, preferences, and interests relating to Defendant's products. At scale, this data enables Defendant to assess trends across its music artists and within the broader music entertainment market. Defendant monetizes this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

---

[33] https://support.appreciationengine.com/support/solutions/articles/47001211663-the-social-networks-you-can-track.

[34] *See id.*

95. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Websites can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[35] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

96. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

97. By falsely representing consumers' ability to decline non-required cookies, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendant unjustly enriches itself at the expense of consumer privacy and autonomy. Defendant deprives consumers of the ability to decide whether, and on what terms, their data may be monetized.

## PLAINTIFFS' EXPERIENCES

**Vishal Shah**

98. Plaintiff Shah visited the postmalone.com and imaginedragonsmusic.com Websites to browse information about the artists' music and related products on multiple occasions during the last four years, including, in or around March 15, 2024.

99. When Plaintiff Shah visited the postmalone.com and imaginedragonsmusic.com Websites, the Websites immediately presented him with Defendant's popup cookie consent banner, which provided the option to click the "Cookie Choices" link. Plaintiff Shah viewed Defendant's representation on the popup cookie consent banner that "We are passionate about music. To help us share that passion we'd like to use cookies and similar technologies to

[35] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

personalize your experiences on our sites and to advertise on other sites. For more information and additional choices click Cookie Choices below."

100. Plaintiff Shah clicked the manage "Cookie Choices" link. The Websites then displayed to Plaintiff Shah the cookie consent preferences window. Plaintiff Shah clicked "Decline All" to reject all cookies, including "Online Advertising" and "Performance and Analytics" cookies. Plaintiff Shah believed that clicking the "Decline All" button would allow him to opt out of, decline, and/or reject all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of user data to third-party social media, advertising, and analytics companies for the purposes of providing performance, analytics, and personalization services).

101. In clicking the "Decline All" button, Plaintiff Shah gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the postmalone.com and imaginedragonsmusic.com Websites. Further, Plaintiff Shah specifically rejected, based on Defendant's representations, those cookies used to "personalize his experience, connect with social networks, and tailor advertising to better match his interests" including those used in "tracking across [Defendant's] sites, sites operated by third parties, and multiple devices" and those cookies that share information with third parties. In reliance on these representations and promises, only then did Plaintiff Shah continue browsing the postmalone.com and imaginedragonsmusic.com Websites.

102. Plaintiff Shah interacted with the Websites by searching for and viewing specific content. On postmalone.com, Plaintiff Shah looked for and clicked links and buttons to view tour dates, including selecting the link for the Post Malone April 2024 Stagecoach show. That interaction generated and transmitted to the Third Parties a descriptive URL[36] reflecting Plaintiff's request for information about that specific tour date, as well as, without limitation,

[36] https://www.bandsintown.com/e/104890868?app_id=umg_republicrecords_postmalone&came_from=267&utm_medium=api&utm_source=public_api&utm_campaign=event&affil_code=umg_us.

session information, user identifiers, device information, button interactions and events, referring and clicked full-string URLs, and geolocation data.

103. Plaintiff Shah also browsed merchandise on imaginedragonsmusic.com by clicking product-category buttons and product links, including links for hooded sweatshirts. Those actions caused the transmission of full string URLs to the Third Parties that identified the merchandise Plaintiff viewed, including full string URLs such as https://shop.imaginedragonsmusic.com/collections/hoodies/products/vintage-graphic-hoodie. That interaction generated and transmitted to the Third Parties a descriptive URL[37] reflecting Plaintiff's request for information about that specific merchandise, as well as, without limitation, session information, user identifiers, device information, button interactions and events, referring and clicked full-string URLs, and geolocation data.

104. Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for personalized content, advertising, analytics, and social media, to be placed on Plaintiff Shah's device and/or transmitted to the Third Parties along with user data, without Plaintiff Shah's knowledge. Accordingly, Defendant's representation to Plaintiff Shah that he could reject the use and/or placement of all "Online Advertising" and "Performance and Analytics" cookies and tracking technologies while he browsed the Websites was false. Contrary to what Defendant made Plaintiff Shah believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

105. Then, as Plaintiff Shah continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner and cookie consent preferences window, and despite Plaintiff Shah's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or

[37] https://www.bandsintown.com/e/104890868?app_id=umg_republicrecords_postmalone&came_from=267&utm_medium=api&utm_source=public_api&utm_campaign=event&affil_code=umg_us.

transmission of cookies along with user data, including those involved in providing personalized content, advertising, analytics, and social media content from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Shah's Private Communications, as defined in ¶ 21 (excluding user input search queries but including full string URLs and buttons indicative of specific interests), as Plaintiff Shah browsed the Websites.

106. Defendant's representations that consumers could "Decline All" or toggle off all "Online Advertising" and "Performance and Analytics" cookies while Plaintiff Shah and users browsed the Websites, or at least those involved in providing personalized content, advertising, and analytics services, were untrue. Had Plaintiff Shah known this fact, he would not have used the Websites. Moreover, Plaintiff Shah reviewed the popup cookie consent banner and cookie consent preferences window prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to "Decline All" cookies or toggle off all "Online Advertising" and "Performance and Analytics" cookies, Plaintiff Shah would have noticed it and would not have used the Websites or, at a minimum, he would have interacted with the Websites differently.

107. Plaintiff Shah continues to desire to browse content featured on the Websites. Plaintiff Shah would like to browse websites that do not misrepresent that users can decline all cookies. If the Websites were programmed to honor users' requests to decline all cookies and tracking technologies, Plaintiff Shah would likely browse the Websites again in the future, but will not do so until then. Plaintiff Shah regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Shah does not know how the Websites are programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Websites honors users' requests to decline all cookies and tracking technologies, Plaintiff Shah will be unable to rely on Defendant's representations when browsing the Websites in the future absent an injunction that prohibits Defendant from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools.

As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Shah is not a software developer and has not received training with respect to HTTP network calls.

**Christine Wiley**

108. Plaintiff Wiley visited the arianagrande.com, icespicemusic.com, universalmusic.com, nickiminajofficial.com, theweekend.com, and lilyachtyofficial.com Websites to browse information about music and related products on multiple occasions during the last four years, including on or about July 15, 2021 (universalmusic.com); September 15, 2022 (universalmusic.com); December 28, 2023 (nickiminajofficial.com); April 15, 2024 (universalmusic.com); and December 15, 2024 (universalmusic.com); and December 15, 2024 (icespicemusic.com and universalmusic.com).

109. When Plaintiff Wiley visited the arianagrande.com, icespicemusic.com, universalmusic.com, nickiminajofficial.com, theweekend.com, and lilyachtyofficial.com Websites, the Websites immediately presented her with Defendant's popup cookie consent banner, which provided the option to click the "Cookie Choices" link. Plaintiff Wiley viewed Defendant's representation on the popup cookie consent banner that "We are passionate about music. To help us share that passion we'd like to use cookies and similar technologies to personalize your experiences on our sites and to advertise on other sites. For more information and additional choices click Cookie Choices below."

110. Plaintiff Wiley clicked the manage "Cookie Choices" link. The Websites then displayed to Plaintiff Wiley the cookie consent preferences window. Plaintiff Wiley clicked "Decline All" to reject all cookies, including "Online Advertising" and "Performance and Analytics" cookies. Plaintiff Wiley believed that clicking the "Decline All" button would allow her to opt out of, decline, and/or reject all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of user data to third-party social media, advertising, and

analytics companies for the purposes of providing performance, analytics, and personalization services).

111. In clicking the "Decline All" button, Plaintiff Wiley gave Defendant notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the arianagrande.com, icespicemusic.com, universalmusic.com, nickiminajofficial.com, theweekend.com, and lilyachtyofficial.com Websites. Further, Plaintiff Wiley specifically rejected, based on Defendant's representations, those cookies used to "personalize her experience, connect with social networks, and tailor advertising to better match her interests," including "tracking across [Defendant's] sites, sites operated by third parties, and multiple devices" and those cookies that share information with third parties. In reliance on these representations and promises, only then did Plaintiff Wiley continue browsing the arianagrande.com, icespicemusic.com, universalmusic.com, nickiminajofficial.com, theweekend.com, and lilyachtyofficial.com Websites.

112. Plaintiff Wiley interacted with the Websites by searching for and viewing specific content including merchandise. In particular, she looked for and clicked on product-category and product buttons and links, e.g., /https://shop.nickiminajofficial.com/products/ltisy-charm-necklace; https://shop.nickiminajofficial.com/products/pink-friday-2-lp; https://shop.nickiminajofficial.com/collections/super-freaky-girl/products/bling-tumbler) and links to related topics and merchandise (e.g., https://pinkfridaynails.com/). Each of those actions caused the transmission of full string URLs to the Third Parties that identified the specific merchandise and topics that Plaintiff viewed, as well as, without limitation, session information, user identifiers, device information, button interactions and events, referring and clicked full-string URLs, and geolocation data.

113. Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for personalized content, advertising, analytics, and social media, to be placed on Plaintiff Wiley's device and/or transmitted to the Third Parties along with user data, without Plaintiff Wiley's knowledge.

Accordingly, Defendant's representation to Plaintiff Wiley that she could reject the use and/or placement of all "Online Advertising" and "Performance and Analytics" cookies and tracking technologies while she browsed the Websites was false. Contrary to what Defendant made Plaintiff Wiley believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendant had already caused that to happen.

114. Then, as Plaintiff Wiley continued to browse the Websites in reliance on the promises Defendant made in the cookie consent banner and cookie consent preferences window, and despite Plaintiff Wiley's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, advertising, analytics, and social media content from the Third Parties on her device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Wiley's Private Communications, as defined in ¶ 21 (excluding user input search queries but including full string URLs and buttons indicative of specific interests), as Plaintiff Wiley browsed the Websites.

115. Defendant's representations that consumers could "Decline All" cookies and tracking technologies while Plaintiff Wiley and users browsed the Websites, or at least those involved in providing personalized content, advertising, and analytics services, were untrue. Had Plaintiff Wiley known this fact, she would not have used the Websites. Moreover, Plaintiff Wiley reviewed the popup cookie consent banner and cookie consent preferences window prior to using the Websites. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to "Decline All" cookies and tracking technologies, Plaintiff Wiley would have noticed it and would not have used the Websites or, at a minimum, she would have interacted with the Websites differently.

116. Plaintiff Wiley continues to desire to browse content featured on the Websites. Plaintiff Wiley would like to browse websites that do not misrepresent that users can reject cookies and tracking technologies. If the Websites were programmed to honor users' requests to

decline all cookies and tracking technologies, Plaintiff Wiley would likely browse the Websites again in the future, but will not do so until then. Plaintiff Wiley regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Wiley does not know how the Websites are programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Websites honors users' requests to reject all tracking technologies, Plaintiff Wiley will be unable to rely on Defendant's representations when browsing the Websites in the future absent an injunction that prohibits Defendant from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Wiley is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

117. Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

> **Class**: All persons who browsed any of the Websites in the State of California after clicking the "Cookie Choices" link and declining cookies in the cookie consent preferences window.

118. This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

119. **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimates that it is composed of more than 100 persons. The persons in the Class are so numerous that the

joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

120. **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to reject all cookies and tracking technologies on the Websites, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Websites.

121. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a. Whether Defendant's actions violate California laws invoked herein; and

b. Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

122. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Website, clicked the "Cookie Choices" link, and rejected cookies by either clicking the "Decline All" button or toggling off all "Online Advertising" and "Performance and Analytics" cookies, and had their confidential Private Communications intercepted by the Third Parties.

123. **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will

establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

124. **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

125. Plaintiffs reallege and incorporates the paragraphs of this Complaint as if set forth herein.

126. To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

127. Defendant has intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein;

(ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

128. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could decline cookies and tracking technologies before proceeding to browse the Websites. Plaintiffs and other Class members directed their electronic devices to access the Websites and, when presented with the popup cookies consent banner and cookie consent preferences window on the Websites, Plaintiffs and Class members rejected cookies and reasonably expected that their and their rejection of such cookies and tracking technologies would be honored. That is, they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Websites. Plaintiffs and Class members also reasonably expected that, if they rejected such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Websites.

129. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

130. Defendant, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic

information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. The data that Defendant allowed third parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

131. Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

132. Defendant's intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

133. Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

134. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

135. Plaintiffs and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

136. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' choice reject cookies and tracking technologies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Second Cause of Action: Intrusion Upon Seclusion**

137. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

138. To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

139. By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

140. The Third Parties' tracking and collecting of Plaintiffs' and Class member's Private Communications on the Websites using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by

Plaintiffs and Class members, and, in fact, those Website users specifically chose to "Decline All" cookies and tracking technologies or toggle off all "Online Advertising" and "Performance and Analytics" cookies and tracking technologies in the cookie consent preferences window.

141. Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their and their Private Communications on the Websites based on Defendant's promise that users could "Decline All" cookies and tracking technologies or toggle off all "Online Advertising" and "Performance and Analytics" cookies, as well as state criminal and civil laws designed to protect individual privacy.

142. Defendant's intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that Website users could "Decline All" cookies and tracking technologies (or at least all "Online Advertising" and "Performance and Analytics" cookies) when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers rejected all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendant's false representations, that when they and they declined "All" cookies and tracking technologies or toggled off all "Online Advertising" and "Performance and Analytics" cookies and tracking technologies, Defendant would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

143. Defendant's conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Websites.

144. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

145. Plaintiffs and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

146. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' choice to reject cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

147. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

148. California Penal Code § 631(a) provides, in pertinent part:

> "Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

149. The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

150. Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous*

> *dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360–61 (emphasis supplied; internal citations omitted).

151. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192–93 (1978). Thus, to establish liability under § 631(a), Plaintiffs need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," did ***any*** of the following:

> [i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;
>
> [ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;
>
> [iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Cal. Penal Code § 631(a).

152. CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

153. Defendant is a "person" within the meaning of California Penal Code § 631.

154. Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

155. The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

156. Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

157. Under § 631(a), Defendant must show it had the consent of all parties to a communication.

158. At all relevant times, Defendant caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Websites in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

159. At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of

electronic communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

160. Plaintiffs' and Class members' Private Communications with Defendant's Websites consisted of intentional, content-bearing electronic communications reflecting users' affirmative decisions, actions, choices, preferences, and activities. As Plaintiffs and Class members interacted with the Websites—by clicking links, selecting products, searching for information, and navigating pages—the Websites transmitted communications containing the contents of those interactions, including the specific URLs requested and the information encoded within them, to the Third Parties.

161. Defendant caused these communications to be automatically intercepted by Third Parties while in transit. The intercepted contents revealed what Plaintiffs and Class members sought and viewed, such as particular products, merchandise categories, artist news, and event information, as reflected in URLs including, for example: https://shop.nickiminajofficial.com/products/ltisy-charm-necklace; https://shop.nickiminajofficial.com/products/pink-friday-2-lp; https://shop.nickiminajofficial.com/collections/super-freaky-girl/products/bling-tumbler; https://www.bandsintown.com/e/104890868?... (linking to tickets for the Post Malone April 2024 Stagecoach tour); and https://shop.imaginedragonsmusic.com/collections/hoodies/products/vintage-graphic-hoodie.

162. At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

163. Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or

otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to "Decline All" cookies and tracking technologies or toggle off all "Online Advertising" and "Performance and Analytics" cookies in the cookie consent preferences window.

164. The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Websites and where the Third Parties—as caused by Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

165. Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

166. Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

167. Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with

Defendant. Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to music artists and related products. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their request to "Decline All" cookies and tracking technologies or toggle off all "Online Advertising" and "Performance and Analytics" cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**<u>Fourth Cause of Action</u>: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)**

168. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

169. The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

170. California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

171. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

172. The Third Parties' cookies and the corresponding software code installed by Defendant on its Websites are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b). This information is specific to "communications" from Plaintiffs as described above (see, e.g., ¶¶ 160-161).

173. At all relevant times, Defendant caused the Third Parties' cookies and the corresponding software code—which are pen registers—to be placed on Plaintiffs' and Class members' browsers and devices, and/or to be used to transmit Plaintiffs' and Class members' IP address and user-agent information. *See Greenley v. Kochava,* 2023 WL 4833466, at *15–16 (S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5–11 (N.D. Cal. Oct. 21, 2024).

174. Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Websites. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014). ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

175. Plaintiffs and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendant that they did not consent to the Websites' use of third-party cookies by clicking "Decline All" cookies and tracking technologies or toggling off all "Online Advertising" and "Performance and Analytics" cookies.

176. Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

177. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

178. Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

## <u>Fifth Cause of Action</u>: Unjust Enrichment

179. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

180. Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

181. Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentations that users could adjust their "Cookie Choices" to "Decline All" cookies and tracking technologies or toggle off all "Online Advertising" and "Performance and Analytics" cookies and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members rejected such cookies.

182. Plaintiffs and Class members' Private Communications have conferred an economic benefit on Defendant.

183. Defendant has been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

184. Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendant at their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiffs and Class members.

185. It would be unjust for Defendant to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

186. There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

187. Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

188. Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

## PRAYER FOR RELIEF

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully requests judgment against Defendant as follows:

A. Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B. An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C. An award of punitive damages;

D. An award of nominal damages;

E. An order for full restitution;

F. An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G. An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H. For reasonable attorneys' fees and the costs of suit incurred; and

I. For such further relief as may be just and proper.

Dated: January 14, 2026

**GUTRIDE SAFIER LLP**

*/s/ Anthony J. Patek*

Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
Anthony J. Patek (State Bar No. 228964)
anthony@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiff*